UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

FAIR HOUSING JUSTICE CENTER, INC.;
JOSHUA ROBINSON; JOHN-MARTIN GREEN;         16 Civ. 5958
INGA BALLARD; and SAMUEL GATES,

                        Plaintiffs,         **COMPLAINT AND
DEMAND FOR JURY TRIAL**

            v.

ROBERT RANKELL & MARTIN RANKELL, LP;
ROBERT RANKELL; MARTIN RANKELL;
ANASTAS KARAKISIDI; AND FAINA
KARAKISIDI,

                   Defendants.

-------------------------------------------------------------X

        Plaintiffs Fair Housing Justice Center, Inc., Joshua Robinson, John-Martin Green,

Inga Ballard, and Samuel Gates, by and through their attorneys, Cuti Hecker Wang LLP, for

their Complaint allege as follows:

## INTRODUCTION

        1.     This action seeks to remedy the blatant race discrimination in the renting of

residential apartments at 1695 East 21st Street in Brooklyn (the "Building"), where African

Americans are told falsely that apartments are not available when they are.  White applicants, in

contrast, are welcomed and ushered in to view available apartments in the Building, sometimes

within hours of African Americans being told there is nothing for them.

        2.     In the spring and summer of 2016, the Fair Housing Justice Center ("FHJC"), a

non-profit organization dedicated to ensuring that all people have equal access to housing

opportunities in the New York City region, sent African American and white testers to the

Building posing as prospective tenants.  The results of these tests demonstrate starkly that the

Building's employees and agents treat prospective tenants very differently depending on the color of their skin.  During recorded conversations, Defendants Anastas Karakasidi and Faina Karakasidi (the "Karakasidi Defendants") – the Building's superintendent and his wife, who respond to inquiries about and, depending on the race of the prospective tenant, show available apartments – repeatedly lied to the African American testers about the availability of apartments, telling them that no apartments would be available for months, even as they were at the same time showing or offering available apartments to the white testers.

3.      Defendant Anastas Karakasidi diligently followed up with white testers, sometimes calling multiple times to check whether they remained interested in renting available units in the Building.  But he never once called an African American tester, and instead steered the African Americans toward other buildings.  The Karakasidi Defendants also told African Americans that apartments in the Building were too expensive, despite never asking about their income or issuing such warnings to white testers.

4.      In New York City, segregated housing still exists, as the building at issue here makes clear.  Segregation is particularly acute in Midwood, Brooklyn, where the Building is located.  A 2012 article from the *Huffington Post* describes Midwood, in which most residents are white, as "the least diverse neighborhood in New York City."

5.      This segregation exists in part because of the acts of deception and steering by Defendants, notwithstanding the laws that have been in existence for more than 150 years to eradicate such behavior, starting with the Civil Rights Act of 1866.  Defendants' conduct must not be condoned, and must be redressed.  Plaintiffs are entitled to declaratory and injunctive relief, compensatory damages, punitive damages, and an award of costs and attorneys' fees.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and pursuant to 42 U.S.C. § 3613.

7.     Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b)(2).

## JURY DEMAND

8.     Plaintiffs hereby demand a trial by jury.

## PARTIES

9.     Plaintiff FHJC is a non-profit organization incorporated in the State of New York and based in New York City.  FHJC is dedicated to ensuring that all people have equal access to housing opportunities in the New York City region by eliminating housing discrimination and creating open and inclusive communities.  FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory housing policies and practices, which diverted resources away from other FHJC activities.  Defendants' discriminatory housing policies and practices also frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in the New York City region.

10.     Plaintiff Joshua Robinson is an African American man who is a citizen of the United States and a resident of Brooklyn, New York.  At all relevant times, Plaintiff Robinson worked for FHJC as a tester.

11.     Plaintiff John-Martin Green is an African American man who is a citizen of the United States and a resident of New York, New York.  At all relevant times, Plaintiff Green worked for FHJC as a tester.

12.     Plaintiff Inga Ballard is an African American woman who is a citizen of the United States and a resident of New York, New York.  At all relevant times, Plaintiff Ballard worked for FHJC as a tester.

13.     Plaintiff Samuel Gates is an African American man who is a citizen of the United States and a resident of Brooklyn, New York.  At all relevant times, Plaintiff Gates worked for FHJC as a tester.

14.     Upon information and belief, Defendant Robert Rankell & Martin Rankell, LP is a New York limited partnership that owns the Building.  Upon information and belief, Defendant Robert Rankell & Martin Rankell, LP and its principals are responsible for establishing, supervising, and enforcing the policies and practices through which apartments at the Building are rented and through which tenants are selected.

15.     Upon information and belief, Defendant Robert Rankell is a natural person residing in New York.  Upon information and belief, Robert Rankell is a principal of Robert Rankell & Martin Rankell, LP, and a managing agent of the Building.  Upon information and belief, Robert Rankell is responsible for establishing, supervising, and enforcing the policies and practices through which apartments at the Building are rented and through which tenants are selected.

16.     Upon information and belief, Defendant Martin Rankell is a natural person residing in New York.  Upon information and belief, Martin Rankell is a principal of Robert Rankell & Martin Rankell, LP, and a managing agent of the Building.  Upon information and belief, Martin Rankell is responsible for establishing, supervising, and enforcing the policies and practices through which apartments at the Building are rented and through which tenants are selected.

17.     Upon information and belief, Defendant Anastas Karakasidi is a natural person residing at the Building in Brooklyn, New York.  Upon information and belief, Anastas Karakasidi is the superintendent of the Building.  Upon information and belief, at all relevant times, Anastas Karakasidi was an employee and agent of Robert Rankell & Martin Rankell, LP with actual and apparent authority to inform prospective tenants about apartments at the Building, show prospective tenants apartments, screen applicants for suitability, and provide prospective tenants with applications for apartments.

18.     Upon information and belief, Defendant Faina Karakasidi is a natural person residing at the Building in Brooklyn, New York.  Upon information and belief, Faina Karakasidi is the wife of the superintendent of the Building.  Upon information and belief, at all relevant times, Faina Karakasidi was an agent of Robert Rankell & Martin Rankell, LP with actual and apparent authority to screen applicants for suitability and to inform (or not inform) prospective tenants about apartments at the Building.

## FACTUAL ALLEGATIONS

19.     Founded in 2005, the mission of the Fair Housing Justice Center is to eliminate housing discrimination, promote open, accessible, and inclusive communities, and strengthen enforcement of the fair housing laws.

20.     FHJC dispatches individuals as "testers" – persons who pose as prospective renters or homebuyers for the purpose of obtaining information about the conduct of landlords, superintendents, real estate brokers, cooperative and condominium boards, lenders, sellers, and others to determine whether illegal housing discrimination is taking place.

21.     At all relevant times, Plaintiffs Robinson, Green, Ballard, and Gates, as well as the white testers who inquired about apartments for rent at the Building, worked for FHJC as testers.

22.     Prior to participating in the testing investigation of the Building, Plaintiffs Robinson, Green, Ballard, and Gates, as well as the white testers, received training from FHJC, which included instructions on conducting a test, preparing tester report forms, and using concealed digital audio recorders during tests.

23.     As detailed below, the testing that FHJC and its testers performed demonstrates that Defendants regularly discriminate against African Americans with respect to renting apartments at the Building in violation of federal, state, and local fair housing laws.

**White Testers' Preliminary Visits to the Building**

24.     On March 15, 2016, at approximately noon, a white female tester ("White Tester 1") posing as a prospective tenant went to the superintendent's apartment in the Building. Defendant Anastas Karakasidi, who identified himself to the tester as the superintendent of the Building, answered the door.

25.     The white tester asked Defendant Anastas Karakasidi whether there were any available apartments in the Building.

26.     Defendant Anastas Karakasidi responded by informing the tester that no apartments were available.  He then asked for the white tester's phone number and told her that he would call when an apartment became available.

27.     Despite the fact that no apartments were currently available, Defendant Anastas Karakasidi provided the white tester with additional information about the Building, including

rents, and also asked the white tester for information about herself and who would be living in the apartment.

28.     When White Tester 1 asked whether there was a real estate company that she could contact about renting an apartment in the Building, Defendant Anastas Karakasidi explained that it would be cheaper if she rented through him, and reaffirmed that he would call when a unit became available.

29.     On April 27, 2016, at approximately 12:20 p.m., a white male tester ("White Tester 2") posing as a prospective tenant found Defendant Anastas Karakasidi at the Building and asked him whether any one or two-bedroom apartments were available.

30.     Defendant Anastas Karakasidi responded "not yet" and asked for the white tester's phone number.

31.     Defendant Anastas Karakasidi provided the white tester with information about the Building, including rents and lease terms, and asked the tester questions about where he lived, his citizenship status, and who would be living in the apartment.

32.     Defendant Anastas Karakasidi assured the white tester that if his "boss" called to inform him about a vacant one or two-bedroom apartment, he would call the white tester to let him know.

33.     Defendant Anastas Karakasidi advised the white tester that the Building worked with three real estate agents, but that it would be better for the tester to rent directly through him because the agents imposed an additional charge.  Defendant Anastas Karakasidi stated that he would be due a "bonus" for helping the white tester rent an apartment, but that the amount would be negotiable and payable over time.

7

34.     During the visit, Defendant Anastas Karakasidi informed the white tester that there was a vacant apartment in the building that was undergoing renovation.  He stated that the apartment might not be available for rent by the public (because an existing tenant might want it) but he agreed to show the white tester the apartment so that the tester would know what apartments in the Building look like.

35.     While the white tester viewed the apartment, Defendant Anastas Karakasidi promised again that he would call him if that apartment – or another apartment in the Building – became available.

### The May 2016 Tests

36.     On May 10, 2016, at 4:44 p.m., Defendant Anastas Karakasidi called White Tester 1 and left an inaudible message.

37.     That same day, at 4:53 p.m., Defendant Anastas Karakasidi called White Tester 2 and left a voicemail stating that he had the tester's number because of the tester's interest in an apartment, and asking the tester to call back if the tester was still interested in an apartment.

38.     On May 12, 2016, at 11:03 a.m., Defendant Anastas Karakasidi again called White Tester 2 and stated that he was calling "about the apartment."  He asked White Tester 2 to call him back if he was interested.

39.     One minute later, at 11:04 a.m., Defendant Anastas Karakasidi called White Tester 1 and left a voicemail stating that he had an "available apartment," and that White Tester 1 should call back if she was still interested.

40.     At approximately 1:00 p.m. on May 12, 2016, White Tester 1 returned Defendant Anastas Karakasidi's phone call.

41.     Defendant Anastas Karakasidi informed White Tester 1 that a one-bedroom apartment was available in the Building at a rent of $1,450 per month, including heat and water (but not electricity).  He also explained that the white tester would be required to provide one-month's security deposit.

42.     Defendant Anastas Karakasidi offered to show White Tester 1 the apartment, and he and the tester discussed scheduling a visit.  Defendant Anastas Karakasidi urged White Tester 1 to visit as quickly as possible, because the apartment could be rented by somebody else if that person visited sooner.

43.     On Friday, May 13, 2016, at 10:24 a.m., White Tester 1 called Defendant Anastas Karakasidi and asked if she and her husband could see the available apartment that day.  They agreed that she and her husband would visit between 3:00 p.m. and 5:00 p.m.

44.     At approximately 4:00 p.m. that same day, a white male tester ("White Tester 3") posing as a prospective tenant went to the Building and found Defendant Anastas Karakasidi. White Tester 3 asked Defendant Anastas Karakasidi whether any apartments were available in the Building.

45.     Defendant Anastas Karakasidi asked how many people would be living in the apartment, and informed White Tester 3 that the rent would be $1,450 (water and heat included). He also informed White Tester 3 that the apartment was already vacant.

46.     Defendant Anastas Karakasidi informed White Tester 3 that he would call him if the apartment was available (he said he was not sure it was available because his boss was not in Brooklyn that day).

47.     Defendant Anastas Karakasidi showed White Tester 3 the apartment; during the tour, he and White Tester 3 spoke about the apartment and application process, as well as White Tester 3's current residence and work.

48.     Defendant Anastas Karakasidi informed White Tester 3 that if nobody rented the apartment before then, he would give the white tester an application for the apartment on Monday.

49.     At 4:16 p.m., Defendant Anastas Karakasidi called White Tester 1 and left a message telling her that he was waiting for her to visit the Building.  He asked her to call to let him know when she would arrive.

50.     At approximately 4:30 p.m. on May 13, 2016 – less than twenty minutes after White Tester 3 viewed an available one-bedroom apartment and Defendant Anastas Karakasidi called White Tester 1 to confirm that she would be coming to visit – Plaintiff Joshua Robinson, who is African American, knocked on the door of the Karakasidi Defendants' apartment.

51.     Defendant Faina Karakasidi opened the door, and asked Plaintiff Robinson if he needed an apartment.

52.     Plaintiff Robinson responded that he did, and Defendant Faina Karakasidi then asked if he had an appointment.  Plaintiff Robinson responded that he did not.

53.     Defendant Faina Karakasidi stated that she would need to call her husband.  She then stepped away from the door.

54.     After Defendant Faina Karakasidi stepped away, Plaintiff Robinson heard voices in the background speaking in a foreign language.

55.     Defendant Faina Karakasidi returned after speaking with her husband, Defendant Anastas Karakasidi, and stated that her husband had informed her that no apartments were available at the time, but that Plaintiff Robinson could call again "in the summertime."

56.     Defendant Faina Karakasidi gave Plaintiff Robinson Defendant Anastas Karakasidi's name and number for him to call.  She did not ask for Plaintiff Robinson's number, nor did she ask for any other information about him.

57.     At 5:30 p.m. that day, White Tester 1 called Defendant Anastas Karakasidi to inform him that her day had gotten crazy, and to ask him whether she could visit the following week.  Defendant Anastas Karakasidi warned White Tester 1 that a man (White Tester 3) had viewed the apartment that day, and that he needed to know whether White Tester 1 was interested so that he could inform the prospective tenant.

58.     On May 16, 2016, at 11:48 a.m., Defendant Anastas Karakasidi called White Tester 3 and left a voicemail stating that the one-bedroom apartment was still available for $1,450, and that White Tester 3 could obtain an application from Defendant Anastas Karakasidi.

59.     The voicemail invited White Tester 3 to "come anytime to the building."

60.     Defendant Anastas Karakasidi again called White Tester 3 at 1:44 p.m. that same day.  He reminded White Tester 3 that the tester had viewed an apartment the previous week, and stated that he would give White Tester 3 an application if the tester "want[ed] to rent this apartment."

61.     On May 16, 2016, at 5:30 p.m., White Tester 1 called Defendant Anastas Karakasidi and informed him that she and her husband had selected a different apartment.

62.     Within minutes of concluding his May 16 call with White Tester 1, Defendant Anastas Karakasidi called White Tester 2 to inform him that a one-bedroom apartment was still

available in the Building at a rent of $1,450 per month.  Defendant Anastas Karakasidi left his

number for White Tester 2 to call if the white tester was still interested in the Building.

63.     On May 17, 2016, at 8:49 a.m., Defendant Anastas Karakasidi called White

Tester 3 to ask again whether White Tester 3 was interested in renting the apartment.  He

requested that White Tester 3 let him know "yes or no."

64.     Two minutes later, Defendant Anastas Karakasidi called White Tester 2 for a

fourth time to inform him about available apartments in the Building.  During this call,

Defendant Anastas Karakasidi mentioned the one-bedroom apartment and also stated that a two-

bedroom apartment was available.

65.     At 11:47 a.m. on May 17, White Tester 3 returned Defendant Anastas

Karakasidi's calls and spoke with Defendant Faina Karakasidi.  Defendant Faina Karakasidi

informed White Tester 3 that Defendant Anastas Karakasidi was not home, and asked him to call

back later.

66.     At approximately noon that same day, within hours of Defendant Anastas

Karakasidi calling White Tester 2 and White Tester 3 to notify them about the available

apartment, Plaintiff John-Martin Green, who is African American, visited the Building and met

with Defendant Anastas Karakasidi.

67.     Plaintiff Green informed Defendant Anastas Karakasidi that he was looking for a

one-bedroom apartment.  Defendant Anastas Karakasidi responded that he had rented out a one-

bedroom apartment two weeks earlier, and no longer had one available.

68.     Plaintiff Green asked when another apartment might be available.  Defendant

Anastas Karakasidi responded "maybe two or three months, I don't know."

69.     Plaintiff Green next asked Defendant Anastas Karakasidi how much a one-bedroom apartment would cost.  Defendant Anastas Karakasidi responded (falsely, in light of the one-bedroom apartment being offered to white testers that day for $1,450) that the rent would be $1,700 for a one-bedroom apartment.

70.     Without asking any questions about Plaintiff Green's income or ability to pay, Defendant Anastas Karakasidi stated:  "Expensive?"

71.     Defendant Anastas Karakasidi then pointed to another nearby building and informed Plaintiff Green that the rent would be less expensive.

72.     Defendant Anastas Karakasidi told Plaintiff Green that he would need one month's rent and a security deposit, and that leases run for two years.  He reiterated, however, that he did not know when an apartment would be available.  He stated that it could take some time before a one-bedroom would become available, because tenants in studios were waiting to upgrade.

73.     Defendant Anastas Karakasidi asked where Plaintiff Green lived, and then requested that Plaintiff Green leave his number so that Defendant Anastas Karakasidi could call if an apartment became available.

74.     Defendant Anastas Karakasidi never called Plaintiff Green after Plaintiff Green's visit to the Building.

75.     On May 17, 2016, at approximately 12:30 p.m., White Tester 3 called for Defendant Anastas Karakasidi.  Defendant Faina Karakasidi answered the phone, and White Tester 3 informed her that he was no longer interested in renting the apartment.

76.     On May 19, 2016, at approximately 11:00 a.m., a white male tester ("White Tester 4") posing as a prospective tenant went to the Building and found Defendant Anastas Karakasidi.

77.     White Tester 4 asked Defendant Anastas Karakasidi whether any one-bedroom apartments were available in the building.

78.     Defendant Anastas Karakasidi asked White Tester 4 where he lived, and then informed him that an apartment was available and "ready to move in."

79.     White Tester 4 explained that he and his wife wanted an apartment for June. Defendant Anastas Karakasidi responded that White Tester 4 could "move tomorrow."

80.     Defendant Anastas Karakasidi offered to show White Tester 4 the apartment.  He explained that the rent was $1,450, including heat and hot water, but not electricity.

81.     While showing White Tester 4 the apartment, Defendant Anastas Karakasidi stated that if White Tester 4's wife was interested, White Tester 4 and his wife could return to the apartment, and Defendant Anastas Karakasidi would give them an application.

82.     Defendant Anastas Karakasidi offered White Tester 4 to come by any time for the application, as late as 10:00 p.m. at night, and informed White Tester 4 about a $100 application fee.

83.     Defendant Anastas Karakasidi also spoke with White Tester 4 about other apartments, including two-bedroom apartments, that might become available in the future.

**The July 2016 Tests**

84.     On June 21, 2016, at approximately 12:15 p.m., a white female tester ("White Tester 5") posing as a prospective tenant went to the Building and found Defendant Anastas Karakasidi.

85.     White Tester 5 informed Defendant Anastas Karakasidi that she was looking for a one-bedroom or two-bedroom apartment for herself and her husband.  Defendant Anastas Karakasidi informed White Tester 5 that the rent for a two-bedroom would be $2,050 or more, and that the apartment was not yet ready.

86.     Defendant Anastas Karakasidi asked White Tester 5 for her phone number, and told her that he would call her once an apartment was available and he had learned the rent from the landlord.  White Tester 5 provided a phone number and name for the white tester who would be posing as her husband.

87.     Defendant Anastas Karakasidi also informed White Tester 5 that a tenant was moving out of a one-bedroom apartment that month.  He said the rent would likely be around $1,700, but that the apartment had some damage, which the landlord would fix.

88.     Defendant Anastas Karakasidi offered to show White Tester 5 a two-bedroom apartment, which he did.  He and the tester toured the apartment together.

89.     Defendant Anastas Karakasidi informed the tester that the apartment would be ready in approximately two weeks, and that he would call her then.

90.     On July 5, 2016, at approximately 1:20 p.m., Plaintiff Inga Ballard, who is African American, visited the Building and met with Defendant Faina Karakasidi.  Plaintiff Ballard asked whether any one-bedroom or two-bedroom apartments were available in the building.

91.     Defendant Faina Karakasidi said that Plaintiff Ballard would need to speak with her husband, the superintendent of the Building.  She then suggested that Plaintiff Ballard could leave her number, and that Defendant Faina Karakasidi would check with her husband about whether any apartments were available.

92.     Plaintiff Ballard offered to wait while Defendant Faina Karakasidi checked with her husband.

93.     Defendant Faina Karakasidi eventually reached her husband, with whom she spoke in a foreign language.  She reported back to Plaintiff Ballard that no apartments were available.

94.     Plaintiff Ballard asked for an application "just in case."  Defendant Faina Karakasidi responded that there was a real estate agent, but she did not know the exact name. She eventually gave the name "Ramcell Associates" [sic], located off Kings Highway, on the right side, at 14th Street or 15th Street.

95.     Plaintiff Ballard asked about the rent and Defendant Faina Karakasidi responded that the rent is "very expensive."  When Plaintiff Ballard responded that her and her husband's budget could extend to $2,200, Defendant Faina Karakasidi stated that she was not sure of the rent.

96.     Plaintiff Ballard asked for the name of Defendant Faina Karakasidi's husband, so that she could tell the real estate office.  Defendant Faina Karakasidi would not answer – she instead replied "you can ask, they know."

97.     On July 6, 2016, at approximately 10:15 a.m., White Tester 5 returned to the Building and found Defendant Anastas Karakasidi.

98.     White Tester 5 reminded Defendant Anastas Karakasidi that she had seen the apartment, and asked whether it was available.

99.     Defendant Anastas Karakasidi responded that his boss was away, and that all work on the apartment had stopped, which is why he had not yet called.  But he assured White Tester 5 that the apartment would be ready that month.

100.    White Tester 5 asked if her husband could come see the apartment, and Defendant Anastas Karakasidi responded that her husband could come any time, so long as somebody was at the Building to let him in.

101.    On July 15, 2016, at 2:34 p.m., Defendant Anastas Karakasidi called White Tester 5 and informed her in a voicemail that a one-bedroom apartment was available at a rent of $1,500 per month.

102.    On July 16, 2016, at 1:19 p.m., Defendant Anastas Karakasidi again left a voicemail for White Tester 5 in which he stated that a one-bedroom apartment had become available, at a rent of $1,500 per month.  He invited White Tester 5 to call back if she was interested in the apartment.

103.    At approximately 10:28 a.m. on July 19, 2016, a white male tester ("White Tester 6") posing as a prospective tenant called for Defendant Anastas Karakasidi, and instead spoke to his wife, Defendant Faina Karakasidi.  White Tester 6 identified himself as White Tester 5's husband, and said he was calling to follow up about whether the apartment was still available.

104.    Defendant Faina Karakasidi took down White Tester 6's number, and said that Defendant Anastas Karakasidi would call.

105.    At 11:09 a.m., Defendant Anastas Karakasidi returned the call of White Tester 6, and left a message asking him to call back and stating that he was waiting for the call.

106.    Moments later, at 11:11 a.m., Defendant Anastas Karakasidi called White Tester 5 again and left a message informing her that a one-bedroom apartment was available, and that she should call back if interested.

107.    Immediately after Defendant Anastas Karakasidi left the voicemail for White Tester 5, White Tester 6 returned the call, and stated to Defendant Anastas Karakasidi that he was White Tester 5's husband.

108.    Defendant Anastas Karakasidi confirmed that the apartment was available, that tenants were still living in the unit, but that Defendant Anastas Karakasidi could show the apartment at 6:30 p.m. or 7:30 p.m. that evening.

109.    Defendant Anastas Karakasidi explained that a realtor was showing the apartment to a prospective tenant at 7:00 p.m., and that the tester could view the apartment just before or just after that visit.

110.    White Tester 6 responded that the timing would not work for him, although he confirmed the rent of $1,500 and lease term of two years.  The tester and Defendant Anastas Karakasidi then discussed potential times for a visit that day.

111.    White Tester 6 conducted additional calls that afternoon with the Karakasidi Defendants, which led to him visiting the Building at approximately 3:45 p.m.

112.    During the visit, Defendant Anastas Karakasidi explained that White Tester 6 would need to submit an application, that realtors regularly show apartments in the Building, but that it would be much better if an application came through Defendant Anastas Karakasidi, because realtors charge a month's rent.

113.    White Tester 6 informed Defendant Anastas Karakasidi during the visit that he had received a text message from his wife informing him that a different apartment they were waiting on was available, and that he was no longer interested.

114.    Approximately *ten minutes* after White Tester 6 left the Building after having informed Defendant Anastas Karakasidi that he was no longer interested in renting the available

apartment, Plaintiff Samuel Gates, who is African American, arrived at the Building and met with Defendant Anastas Karakasidi.

115.    Plaintiff Gates informed Defendant Anastas Karakasidi that he was looking for a one-bedroom apartment.  Defendant Anastas Karakasidi responded "I don't have any," because he had rented an apartment two months before.

116.    Plaintiff Gates asked when a one-bedroom apartment might be available. Defendant Anastas Karakasidi stated "maybe in wintertime," and repeated that none was available then.

117.    Plaintiff Gates asked about the rent for a one-bedroom apartment and was told $1,600.

118.    Defendant Anastas Karakasidi offered these responses despite having informed a white tester minutes before that a one-bedroom apartment was available at a rent of $1,500.

119.    Defendant Anastas Karakasidi claimed in his conversation with Plaintiff Gates that people in the Building usually do not move in the summertime.  He then directed Plaintiff Gates to other nearby buildings, and told him that apartments might be available there.

120.    Defendant Anastas Karakasidi never asked Plaintiff Gates for his phone number.

121.    On July 21, 2016, at approximately 12:50 p.m., a white male tester ("White Tester 7") posing as a prospective tenant visited the Building and located Defendant Anastas Karakasidi.  White Tester 7 informed Defendant Anastas Karakasidi that he was interested in a one-bedroom or two-bedroom apartment.

122.    Defendant Anastas Karakasidi initially told White Tester 7 that no two-bedroom apartments were available at that time, and that the rent would be just over $2,000 when an

apartment became available.  He then asked White Tester 7 for his phone number and told him that he would call when a unit became available.

123.    White Tester 7 then asked specifically about one-bedroom apartments, and Defendant Anastas Karakasidi informed him that a one-bedroom apartment would be available by August 1 or August 15.

124.    Defendant Anastas Karakasidi told White Tester 7 that the rent would be $1,500, and he offered to show the tester the apartment.  Defendant Anastas Karakasidi escorted White Tester 7 upstairs and showed him unit E4 – the same unit that White Tester 6 had been shown, and that White Tester 5 and White Tester 6 had been offered, two days earlier.

125.    Defendant Anastas Karakasidi explained that White Tester 7 would need to pay one month's rent and a security deposit up front, and that the rent included heat and water, but not electricity.

126.    At the conclusion of White Tester 7's visit, Defendant Anastas Karakasidi provided the tester with an application, which he advised him to submit to the office identified at the top of the application for approval by "the boss."

127.    The office identified in the application is "Rankell Associates, 1301 Kings Highway, Brooklyn, New York 11229," with a phone number of (718) 375-9100.

128.    On July 25, 2016, at 11:17 a.m., Defendant Anastas Karakasidi called White Tester 7 and left him a message stating that he was calling about the tester filling out an application for the apartment.

129.    On July 28, 2016, at 3:45 p.m., Defendant Anastas Karakasidi called White Tester 7 again to ask about the application that he had given him.  Defendant Anastas Karakasidi asked White Tester 7 in a voicemail to let him know whether the tester wanted the apartment or not.

* * *

130.     Over and over again, Defendants lied to African Americans about the availability and cost of apartments in the Building, while actively seeking out and following up with white applicants.  The behavior evidenced by the testing detailed above is reprehensible.  It subjected the Plaintiffs to debasement and humiliation, conveying to them clearly that they are, in the eyes of the Building's owners, management, and agents, lesser citizens than their white counterparts. It interfered with FHJC's core mission and required FHJC to divert significant and scarce resources from other vital projects.  It furthers racial segregation in housing in Midwood, Brooklyn and throughout New York City.  It must end.

### FIRST CAUSE OF ACTION
(Federal Fair Housing Act – 42 U.S.C. § 3601 *et seq.*)

131.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

132.     Defendants' conduct as set forth above constitutes a refusal to rent, or the refusal to negotiate the rental of, or a denial of housing on the basis of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).

133.     Defendants' conduct as set forth above constitutes discrimination in the terms, conditions, or privileges of the rental of a dwelling, and/or in the provision of services or facilities in connection therewith, because of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(b).

134.     Defendants' conduct as set forth above constitutes the making of statements with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race and color or an intention to make any such preference, limitation, or discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604(c).

135.    Defendants' conduct as set forth above constitutes a representation, because of race or color, that a dwelling is not available for rental when such dwelling is in fact so available in violation of the Fair Housing Act, 42 U.S.C. § 3604(d).

136.    Plaintiffs are aggrieved persons as defined in 42 U.S.C. §§ 3602(d) and (i), have been injured by Defendants' discriminatory conduct, and have suffered damages as a result.

137.    Defendants' unlawful conduct was intentional, willful, and made in disregard for the rights of others.

138.    Accordingly, pursuant to 42 U.S.C. §§ 3613(a) and (c), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
(Civil Rights Act of 1866 – 42 U.S.C. §§ 1981 and 1982)

139.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

140.    Defendants' conduct as set forth above prevented Plaintiffs Robinson, Green, Ballard, and Gates from enjoying the same right to make and enforce contracts as is enjoyed by white citizens under Section 1981 of the Civil Rights Act of 1866 and the same right to lease real property as is enjoyed by white citizens under Section 1982 of the Civil Rights Act of 1866.

141.    Plaintiffs Robinson, Green, Ballard, and Gates have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

142.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

143.    Accordingly, pursuant to 42 U.S.C. §§ 1981, 1982, and 1988, Plaintiffs Robinson, Green, Ballard, and Gates are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
(New York Executive Law § 290 *et seq*.)

144.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

145.    Defendants' conduct as set forth above constitutes the refusal to rent and/or the denial of a housing accommodation and/or the withholding of a housing accommodation because of race or color in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

146.    Defendants' conduct as set forth above constitutes a representation that a housing accommodation is not available for rent or lease when in fact it is so available in violation of Article 15 of the New York Executive Law § 296(5)(a)(1).

147.    Defendants' conduct as set forth above constitutes discrimination because of race or color in the terms, conditions, or privileges of the rental of a housing accommodation or in the furnishing of facilities or services in connection therewith in violation of the New York Executive Law § 296(5)(a)(2).

148.    Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by New York Executive Law § 296(5), in violation of the New York Executive Law § 296(6).

149.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

150.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

151.    Accordingly, pursuant to Article 15 of the New York Executive Law § 297, Plaintiffs are entitled to actual damages, punitive damages, injunctive relief, and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
(New York Civil Rights Law § 40-c)

152.   Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

153.   New York Civil Rights Law§ 40-c(2) provides in relevant part that:  "No person shall, because of race, creed, or color . . . be subjected to any discrimination in his or her civil rights . . . by any other person or by any firm, corporation or institution."

154.    By engaging in the discriminatory conduct as set forth above, Defendants violated New York Civil Rights Law § 40-c.

155.   Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

156.   Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

157.   At or before the commencement of this action, Plaintiffs provided notice of this action to the Attorney General of the State of New York per New York Civil Rights Law § 40-d.

158.   Accordingly, pursuant to New York Civil Rights Law § 40-c, Plaintiffs are entitled to statutory damages, injunctive relief, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
(New York City Administrative Code § 8-107)

159.   Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

160.   Defendants' conduct as set forth above constitutes a refusal to rent or lease or other withholding of a housing accommodation because of race or color in violation of New York City Administrative Code § 8-107(5)(a)(1).

161.    Defendants' conduct as set forth above constitutes discrimination because of race or color with respect to the terms, conditions, or privileges of the rental or lease of a housing accommodation in violation of New York City Administrative Code § 8-107(5)(a)(2).

162.    Defendants' conduct as set forth above constitutes aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden under New York City Administrative Code § 8-107(5), or attempting to do so, in violation of New York City Administrative Code § 8-107(6).

163.    Plaintiffs have served a copy of this Complaint upon the City Commission on Human Rights and the Corporation Counsel, pursuant to New York City Administrative Code § 8-502(c).

164.    Plaintiffs have been injured by Defendants' discriminatory conduct and have suffered damages as a result.

165.    Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

166.    Accordingly, pursuant to New York City Administrative Code § 8-502(a), Plaintiffs are entitled to actual damages, punitive damages, injunctive relief and such other remedies as may be appropriate, and attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following relief:

a.  An order and judgment declaring that Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*, the Federal Civil Rights Act, as amended, 42 U.S.C. §§ 1981, 1982, the New York State Human Rights Law, New

York Executive Law § 290 *et seq*., and the New York City Human Rights Law, New York Administrative Code § 8-107 *et seq*.;

b. An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation from:

(i)  refusing to rent or lease, or refusing to negotiate for the rental or lease of, or otherwise making unavailable or denying a dwelling or housing accommodation to any person because of race or color;

(ii) discriminating against any person in the terms, conditions, or privileges of the rental or lease of a dwelling or housing accommodation, or in the provision of services or facilities in connection therewith, because of race or color; and/or

(iii) coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act, as amended;

c. An order and judgment enjoining Defendants, Defendants' agents, employees, and successors, and all other persons in active concert or participation to:

(i)  make all necessary modifications to their policies, practices, and procedures of offering rentals or leases of dwellings or housing accommodations to the public;

(ii) train all management, agents, and employees on fair housing laws;

(iii) display an Equal Opportunity logo (or statement to that effect) on all advertisements for dwellings and rental property and display in all offices HUD, state, and local fair housing posters;

(iv) allow monitoring of their rental screening and application process and decisions;

(v) retain records to allow for appropriate monitoring;

(vi) develop written procedures on rental and lease processes and fair housing policy to be distributed to all staff and all rental applicants;

(vii) undertake active efforts and steps to ensure that African Americans seek out and obtain assistance from Defendants and are assisted in meaningful ways to rent and lease apartments; and

(vii) establish a system so that their agents can be tested for unlawful discriminatory practices;

d.   An order and judgment awarding monetary damages to compensate Plaintiffs fully for any economic losses, diversion of resources, interference with mission fulfillment, and the humiliation, degradation, embarrassment, and emotional distress suffered due to Defendants' discriminatory conduct;

e.   An order and judgment awarding punitive damages;

f.   An order and judgment awarding Plaintiffs' reasonable attorneys' fees, costs, interest and expenses incurred in prosecuting this action; and

g.   Any further relief that may be just and proper.

Dated: New York, New York
        October 27, 2016

By: _____
        Mariann Meier Wang
        Alexander Goldenberg

CUTI HECKER WANG LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600
mwang@chwllp.com
agoldenberg@chwllp.com

*Attorneys for Plaintiffs*